No. 25808, Kahnimova v. Banks. Mr. Valentini. Good morning, Your Honor. May I reserve two minutes for rebuttal? Yes. Good morning. May it please the Court. This appeal turns on legal error, not factual dispute. This case is not about whether the private school was perfect or whether progress was fast enough. It is about whether parents can be denied reimbursement by being held to a higher burden on prong two than the district is on prong one. Here the DOE failed to present a fake case at all. Yet the IHO, the SRO, and eventually the district court denied reimbursement by imposing public school compliance standards on a unilateral placement, relying on evidence that existed only because the hearing violated IDEA timelines and then skipping the equities analysis entirely. Instead of asking whether the private school was reasonably calculated to confer educational benefit on the student at the time of placement or at any time, the IHO, the SRO, and the district court demanded proof of success, relied on hindsight, and speculated about service delivery. These are all things this Court has rejected. It seems to me, though, that the school conceded that it did not provide the services that it outlined as necessary for the child's educational program, the FAPE, and failed to meet due to staffing shortages. There's no debate about that, correct? Some of those services, Your Honor, yes. Some services were provided but not to the degree that the school determined were necessary to give that child the educational benefit that, you know, intense therapy that the child needed. Yes, and here's part of the problem with how that happened. Here the I-BRAIN school developed an IEP or an education plan, which this Court has held many times the private school does not need to do. So what became an ambitious program or plan for the student all of a sudden became mandates. The private school is not mandated to create an IEP, nor is it mandated to provide every service the parent wants provided for the student. But that was the promise to the parent, right? Effectively, I-BRAIN said if you place your child with us, this is the program we'll implement. And so it seems to me that that is relevant both to the reasonableness of the placement but also doesn't the parent have a claim against the school here? Isn't the problem that the school made a promise to the parent and the school failed to deliver, and as a result, the parent is on the hook for tuition? Which is why if this is to be considered at all, it would be and should be a prong-free analysis. Okay, but doesn't the parent – isn't that really where the fault lays here is that the school failed to deliver on the promises it made? And that's why it was – the reimbursement was denied? Yes and no. There was testimony that the school was going to make up those services. It lost staff when it hired staff. It then testified that the school was going to make up those services. And this is where the SRO speculated that there was not enough time left in the school year. Did they in fact make up the services? Do we now know that? I don't know, Your Honor. Okay, so you don't have a position on whether your client has a cause of action against the school? No, I don't, Your Honor. I don't know. The problem is we're looking at this for the purposes of reimbursement in this school year, which would have ended in June. The school could very well have made up services into the next school year, but that wouldn't be part of this reimbursement. In other words, the school ended the end of June, the next school year starts in July, whether or not services were made up the following year. I would also note that this student was making progress. It's referred to as anecdotal progress, but given this student's disabilities, there was progress. So let me ask you about that. It seems like you have a mixed message on post hoc information. So on the one hand, you don't want us to consider whether the services promised were delivered, but you do want us to consider the progress the student made even with the limited services. It should not be dispositive. First of all, nobody here said this student regressed. They said there was no proof of progress in the record. Yet there is proof. It's described as stant evidence of progress, but there's some evidence of progress. But I'm not trying to have it both ways. If you look at the school and the program, at the time the parent made the unilateral placement, it was an appropriate program for the student. The fact that some services were not delivered, but by the way, if we look at the IDA timelines, the due process complaint was filed July 6th. The hearing should have been completed by September 9th. The fact that we're looking at the entire school year is because the IHO did not adhere to those IDA timelines. In fact, SRO, I believe it was CROAC, in looking at the parent's affidavit signed in August of 2022, where she said there was some progress that was made, the SRO actually said August was too soon to determine whether progress was being made in a program like this. And yet the hearings- Is there an authority that says you evaluate placement at the time of enrollment? I thought, and I thought where you were going in response to Judge Merriam's question, was that we look at the totality of the circumstances. And so that brings everything in. And some of this is after the time of enrollment, but that's just a function of litigation takes some time. And that can cut either way or both ways. And so we, as a review in court, have to look at all of it. There is language that says you look at the unilateral placement at the time it's made, but Your Honor is correct. You do look at the totality of circumstances. But here, if you look at the unilateral placement at the time it was made, this is an appropriate program for this student. Just like if the student needed and was supposed to get transportation for the school year, let's say, and did not, that becomes a reimbursement issue. The district would say they didn't receive the service, so we're not going to reimburse the parent for the transportation. Here, if there were related services, the student didn't get it. And again, there's no evidence here or discussion of regression at all. And you have held that progress is not necessary to determine whether the placement is appropriate. So the idea that this is found to be, and if I may, just to read from the IHO on page 9. I guess first I just want to make sure, Hardison, TK, those are cases where we did take a look at post-enrollment facts. And so I just want to make sure that we are okay to follow that and in your view that that is an appropriate consideration under the totality of circumstances. Or if your argument is something different, which is that time freezes at the time of enrollment and we don't look anything past that. I don't think it freezes, Judge, but in the first instance, if you're going to say the school is appropriate on day one, but then becomes not appropriate, there are times the totality of circumstances is relevant. But here, the student... So can that happen? I mean, isn't that part of the risk of a unilateral placement? Yes, but progress is not one of those circumstances that this court has found is dispositive. In the totality of circumstances here, the student got the related services that she needed two to three days a week instead of five. Okay, that wasn't part of the I-BRAIN IEP, but the I-BRAIN school wasn't required to create an IEP. So if that goal were two to three days in the first instance, does that make this school inappropriate? Again, I think the way to deal with this is the equities rather than saying this student a month, two or three months before this case, the prior year, the same IHO found the same program to be appropriate on I-BRAIN. Well, in this case, didn't they look at the record very carefully, both the IHO and the state officer, and they looked for evidence that the services had been provided, and they also noted that the head of the school was who didn't have personal knowledge of the services that were promised but not provided. Nonetheless, made the statement that the student had progressed but had not really had interaction or observation of the student and could not make that statement. It seems to me that we have to give some deference, or the district court gave deference to the expertise of the hearing officers and the SRO and determined whether or not they appropriately relied on the record, which was, you know, had no evidence of the type you are asserting. Well, the director did testify that she spoke to the child's teachers, and they told her that some progress had been made. If I may just read from the FOFT here, the IHO found the IEP developed by I-BRAIN appears on its face to be both comprehensive and specifically tailored to meet this student's individual needs. The IEP was drafted collaboratively by teachers, related service providers, administrators at I-BRAIN, and then goes on, on the other hand, the district is correct, there is scant evidence in the record regarding progress. Not evidence of regression, no evidence of progress, scant evidence regarding progress. The private placement totality of circumstances as part of the analysis doesn't have to be perfect. And you have so held, and I believe it's Frank G. and Galliardo, it's designed to meet the educational needs of the student. It was designed to do that. That is what should make it appropriate. And then you can discuss whether or not certain services were provided becomes a reimbursement issue, Your Honor. Thank you, counsel. You're reserved a couple minutes for about a minute. Mr. Sinclair. Good morning. May it please the court, Ian Sinclair with the New York City Law Department for Appellees. The district court correctly deferred to the SRO's well-reasoned decision denying plaintiff's request for private tuition reimbursement. So starting with what this court has said in the past, there's no basis for the plaintiff's claim that the adequacy of the private placement turns on what the parent reasonably believed when they opted out of the public school option. Page six of the reply, plaintiff purports to quote this court's decision in CL about making progress under the proposed plan. That quote actually comes from Galliardo, and the preceding clause makes clear that they're talking about the IEP, not about prone to analysis. Indeed, I'm not aware of any decision from this court that has held that SROs should limit the inquiry to the offer made by the private placement or even heavily weigh that evidence above competing evidence. On the contrary, again and again, this court's decisions have held that objective evidence documenting progress is preferable under the law of the circuit and that the core question is whether the private placement provides present tense educational instruction specifically designed to meet the needs of the child. It's an ongoing obligation, and that's really the core difference here. Plaintiff is trying to implicitly compare prongs one and prong two, but they're addressing different scenarios. Prong one is the road not traveled, so all we know is what the parent projected, which is the IEP. Prong two is parallel to what the analysis done when a student actually opts into the public placement. In those contexts, the school district cannot rest on the laurels of a well-crafted IEP. It has to actually provide the services that create a free, appropriate public education. That's what prong two is looking at. It's looking at for the placement that the parent selected, does it provide the services that the school district could not or would not do, and that's why it's a totality of the circumstances. Well, it seems to me that the plaintiff's counsel is arguing that we're being asked to hold the private placement to a higher standard than what would have been required in a public school placement, and arguably this student may have received more services than she would have in a public school setting. So a couple points on that. The first is that the proposed plan that I-BRAIN put forward is roughly identical to what the IEP proposed, so we don't know that they would have gotten more services under the public school district than what they would have gotten at I-BRAIN. But the second is that the plaintiff has described this as the district court and the SRO sort of layered these different requirements on, but that's not what either of those decisions held. When they looked at the threshold question of did they provide the services that were recommended, that was just the first step. Looking at whether they – the next step was then to say, well, based on what was provided, we know roughly half of the services were provided. Did they make progress under those services such that it might still be appropriate even if it wasn't what was initially recommended? That's an alternative outlet, so it's a lower burden, and the SRO acknowledged that it was a lower burden. It said the school district didn't have to produce the plan in the first place, and it didn't have to meet all the same standards that public schools have to. And I think to the – you know, plaintiff relies heavily on Frank G. in the reply, but this kind of extended analysis over time where the student's evidence of progress can be helpful, not just harmful, is exactly what happened in that case. So there the student was – opted for a private placement. It wasn't exactly what was recommended. There weren't specific education in the areas of need, but there was a small-sized classroom, which was part of the recommendation, and the teacher – the student's teacher, in fact, adapted their teaching to that student's needs. It seems like there is some procedural unfairness here. I mean, Ms. Conomova made a decision based on what was going to be provided, and because the process of appealing the denial took as long as it did, and Ibrahim ran into some staffing issues, she then got stuck with a situation that was unforeseeable at the time she made the decision. Well, we actually don't know that it was unforeseeable because we – as we note on page 29 of our brief, even if we credited a plaintiff's argument here, there's nothing in the record about when the staffing shortages began. So we don't know that those staffing shortages weren't known at the time that the parent opted in. So they – even if they – even if that's how the test worked, they still didn't meet that component of their purpose. Well, what if they were? I guess what I'm looking for is what – you know, is this what is contemplated by the totality of the circumstances analysis and the risk borne by the parent making a unilateral placement decision? I think in a sense, yes, it is part of the risk. I think the Supreme Court and this Court have both been clear that you – opting for the private placement is done at the parent's financial risk. And as the person who is selecting the education program, they're sort of the one who's looking at everything. So the burden falls on them to say the thing that was offered me was not appropriate under the Act, but I'm opting for something that is appropriate under the Act or that I think is appropriate under the Act. But that's the point, right, that they think is appropriate. And so what's a parent to do, right? You all make a point in your brief, which I think is well taken, that you can't say we're going to reimburse everyone based on a promise. Those promises might never be fulfilled. I understand that. The flip side of that is what's the parent to do if the public school district's proposed plan is plainly inadequate, which there was no argument here it was adequate. So let's assume for the sake of argument that it is facially inadequate. The parent is left with a choice of gambling with their finances or gambling with their child losing an entire year of education. What's the parent to do? I think it's a tough decision. It's why the risk falls on them. And I think that the question of whether someone is entitled to reimbursement under the statute, which is ultimately predicated on the child receiving public education services, is a different question than whether it's proper for the school to charge the parent tuition. You were asking my colleague about that question on the opening. I mean, there's no evidence in the record about what the agreement was between the parent and Ibrane. But I think it's a separate question of whether it's proper to charge them than whether they met their burden under the statute, which is plainly inadequate. So to be clear, when I'm looking at TM talking about the Burlington-Carter test and that second prong, which is where we are, where is the alternative private placement appropriate, your position is that it is the actual education received, whether that was appropriate, as opposed to whether the parent's decision to place the child there was appropriate. Yes, and I think it has to be, because much like we wouldn't allow a public school district to say, well, we tried to offer something really great and we just didn't come through. That wouldn't satisfy the terms of the IDEA. It wouldn't create, it wouldn't be a thing. Much in the same way, we can't, like schools can't just offer something really nice and then rest on their morals. That wouldn't, again, meet the terms of the statute. And how does it affect the situation here that the parent may have been relying in part on the fact that this particular school was deemed adequate the year before? The year-to-year, each year is analyzed separately, and so we don't. But that doesn't play into appropriateness or reasonableness? I guess if they had met their burden under prong two and we were able to reach the equities, maybe it would have been factored in there. But it doesn't affect the question of, within the school year that was being analyzed, did they receive services that were specially designed to the unique needs of the child? Those services weren't provided, at least to the extent that the SRO found evidenced, yeah, to the extent that the SRO found that those services weren't provided in a way that were actually tailored to them. I see my time is up. Oh, I have another minute. I'll just lastly point out that, as your honors have been discussing, the SRO here did properly consider the entire administrative record. That's really the core question. They thoroughly examined the child's needs. They reviewed the recommended programs, both under I-RAIN's plan and the school district's IEP. They considered what services I-RAIN actually provided and what education benefits the child derived from those. They considered the lack of objective evidence, which was absolutely essential to this court's decision in partisan, that the SRO is best positioned to determine when enough evidence is needed to draw a conclusion. And they weighed I-RAIN's ability to make up those missed sessions, given the Director of Special Education's very candid admission that they were significantly understaffed and had no plan to fill those gaps except for one of the seven services. If there are no further questions, I'll ask this court to affirm. Thank you so much. We'll hear a rebuttal. The student's program at I-RAIN for the 21-22 school year was found to be appropriate. The DOE, in its IEP, included much of the services that were in that I-RAIN IEP and referenced throughout its IEP that the student was making progress at I-RAIN. This wasn't a case where their IEP was found to be insufficient. They didn't put any witnesses on for prong one, so the IHO said she was constrained to find they didn't provide a fate. So it's interesting that the city would say the program was inappropriate, yet built it into their IEP, which is again why I say for the purposes, I think counsel mentioned there was no evidence of the price of tuition and usually that comes in on prong three. Nobody was talking about the cost of the program on prong two. That wasn't appropriate. We get to the cost of the program on prong three, and then we discuss whether or not the parent is entitled to complete reimbursement, complete denial, or some kind of reduced reimbursement. Again here, the evidence in the record, the IHO and the SRO look at the record and say there's no evidence of progress. Although when this court talks about progress, we very often talk about regression. The program must be developed to allow the student to progress during the school year rather than regress. The program, this program was appropriate. The fact that staff members may quit or for whatever reason leave, does that make the program itself, the school, inappropriate? Or does that go to a reduction of tuition or reimbursement? And as you said, perhaps a claim the parent may have against the school rather than the appropriateness of the program itself. Any other questions? Thank you. Thank you, counsel. Thank you both. We'll take the case under advisory. And finally, we'll have our argument in case number 25-117, Simonetti-Simonetti. Ms. Simonetti. Thank you. Ms. Simonetti, whenever you're ready. Good morning. May I please report? Maria Simonetti, Pro Se. Can you pull the microphone closer? Thank you. The STNY mistakenly classified the civil rights claim as a child custody dispute. So I think they're not right to do that. I'm the appealant in this action to litigate my rights, parental rights, the fraud and divorce that my husband did to me. And all the cases he did in Brazil was fraud. I'm married in New York. Defendants fraud and consolidated marital and, sorry, my English, inheritance assets. My in-laws died. I live in a house, $6 million. We have two houses, here and in Brazil. My daughter, older daughter, born in New York. So we have, I was married for 15 years. No work, because I don't need to work. He don't let me work. He kept me like a horse, just doing what he wants. When she was like 13, the oldest daughter, I got pregnant again. So I was not, I was being abused all the time. Financially, he kept the money. I don't have a credit card. I don't have access to the banks, nothing. Just take care of my daughters. I got pregnant again. The baby born eight months. She born before the pregnancy with the stress. I had a lot of stress. When his father died in 2008, 2006, I want to come to New York to take care of my in-law, my father-in-law, and my mother-in-law. The whole family Italian, I love them and I cry for them. I have them like my family also. I call my father-in-law, I call daddy, mom, and his brother was like my brother. So he take me away from the family. He get involved with the bad people in my country. Ms. Simonelli, the issue that we're trying to figure out today is whether your claims belong in this court or the Southern District of New York. I tried all the courts in New York. That's the only court that accepted my case. I went to White Plain to open a case. Brooklyn, they didn't even let me talk with the judge. I'm being damaged, financial damage. After I find out he was involved with bad people, after I start learning English, I read all the papers. I was damaged since I got in a shelter in New York. Could you bring this case in the state court instead of in the federal court? I went everywhere. I went to FBI when I find out. Well, that's still federal. I know. I'm just saying I tried to talk with the FBI investigator. I need protection. My daughter needs protection. Everything that you're complaining about with regard to yourself and your daughter appears to have occurred in Brazil. So what remedies, if any, did you seek from Brazilian courts? She's a citizen. But she has always lived in Brazil. She's never come here from Brazil. Torture. No, but that's not my question. My question is what relief have you sought? She doesn't have her rights. What relief have you, as her mother, sought from courts in Brazil? Sorry? What relief have you, as the child's mother, sought from the courts in Brazil? I misunderstand your question. Sorry. Have you gone to court to file a lawsuit or to gain custody in Brazil? My sister became a lawyer. My daughter became a lawyer to get into the case. After my sister became a lawyer, I have access to the papers. I don't have access to the file. Everything wrong. You can see that he had a travel permission, international travel permission. His name, G-A-S. How a person, a father, opened a case to travel with a little girl, G-A-S. I never was serving. The judge who gave me my daughter to him, temporary, she died. The Supreme Court judge who helped me, he took out his permission to travel. He stopped him to travel. He died. My daughter's daughter died. Everybody's dying. I have to get away from my country. Okay. Thank you, Ms. Simonetti. We'll hear from your adversary. May I conclude something? You have a minute on rebuttal. Okay. So this case is a fraud. I was investigating him. He lied to the embassy. In 2020, I asked the embassy to help me find my daughter. She said, oh, is everything okay? The apartment's beautiful. Look where he is with my daughter. Thank you, Ms. Simonetti. We have your argument. You have one more argument. Would you like to use it now? I'll wait. You'll wait? Okay. Thank you. Thank you. Good morning, Your Honors. Thank you. And may it please the Court, John Moss for the appellees. I would just like to reiterate, as in the papers, the Court does lack jurisdictions matter. Complete diversity is not had. The amount of controversy is absent. Further, jurisdiction under the Hague Convention is not met. Brazil is the home state of child. The claims that the appellant brings under the Uniform Child Custody Jurisdiction and Enforcement Act were not raised before the district court before are inapplicable here. And lastly, I should mention that the appellant has also filed and has pending before the New York State Court a matter that is substantially identical, virtually identical, which is currently pending, which this Court should defer to. I'm sorry. What's the status? It's pending? It is pending for the appellate division. It's on appeal? It is. That's my understanding, yes. I acknowledge the statements that the appellant has made. I'm not speaking to the merits or the substance of what she's mentioned, except to mention that she has a venue which she proceeded in New York State Court prior to the commencement of this action, and that is pending. So we ask that you defer. If you don't have any questions. Okay, thank you. Thank you. First, I didn't understand nothing of what he said, but I want to say something else. So here in his brief, page 9, he says that Appellant and her sister falsely reported to Brazilian Federal Police that Gerard engaged in criminal activity involving money transfer to Panama. Gerard was fully exonerated. So they talk like I created a case. I find out he's involved with the Thomas Franklin Tabut, fooling the FBI. I collaborated with the U.S. I went to police, Federal Police in Brazil. Before I talk to the FBI or to the Interpol, I have to explain everything to the Federal. What are you going to tell them? I have to tell them everything before I get it to the U.S. officer. So I get in trouble in my country. And he says, oh, I am exonerated. Last page says, this was an investigation and was forwarded to the prosecutor. How a person lied to a Supreme Court in the U.S. If I lie, I will be kicked out from the country. I took like five years explaining that the embassy in Brazil took my green card. I have the right to come to the… I have green card, I have two daughter citizen. I have all his money is from here. So may I ask the court, if you guys cannot protect my daughter because she's not here, no jurisdiction to protect my daughter. He filed the custody. Page two. It sounds like you have a case in New York State Court on appeal as well. He filed a custody that say, page six in his appendix. This is the custody and say, mother, guardian, I have the legal custody. And he say, I have the Brooklyn court say he has the custody. They wrongly granted the custody to the father because he's American. I'm telling them that's wrong. I have the legal custody. So they don't let me bring my daughters with me. Thank you, Ms. Simonetti. I think we have your argument. Thank you both. We'll take the case under advisement. Thank you, Your Honor. So one minute more? No, we are done, unfortunately. But we do have your argument. We have your papers. And we've heard your argument. May we please see the 129 that I filed? If you guys cannot protect my daughter. We have the papers. Thank you. Thank you. I'm sorry for my English. And with that, I'll ask the courtroom deputy to adjourn. Court stands adjourned.